IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 01–cv–02521–EWN–MJW

BARBARA J. BERRY,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

This is a social security benefits appeal under 42 U.S.C. § 405(g).  Plaintiff Barbara Berry

challenges the final decision of the Commissioner of Social Security (the "Commissioner"),

denying her application for disability insurance benefits.  Jurisdiction is premised upon 42 U.S.C.

§ 405(g) (2006).

### FACTS

**1.**    ***Medical Evidence***

Plaintiff was born on September 4, 1955 and was forty-three years old at the initial onset

of her alleged disability.  (Admin. R. at 72, 559 [filed Oct. 19, 2005] [hereinafter "Admin. R."].)

Plaintiff earned a graduation equivalency degree, attended one year of college, and has worked in

the vocationally relevant past as a restaurant hostess, waitress, receptionist, bookkeeper, cashier, and payroll clerk.  (*Id*. at 73, 350.)  Plaintiff alleges that she became unable to work beginning on October 20, 1998, due to degenerative disc disease, asthma, depression, carpal tunnel syndrome, tendinitis, and anxiety.[1]  (*Id*. at 72, 89, 103.)

Medical records from the Southern Colorado Medical Clinic reveal that Plaintiff received treatment for asthma, swollen joints, and back pain from June 1998 through February 1999.  (*Id*. at 149–61.)  Plaintiff reported that she sustained an injury at work in June 1998, which prompted medical professionals to take X-rays of Plaintiff's lumbar spine.  (*Id*. at 157.)  The X-rays revealed that Plaintiff had degenerative disc disease, spondylolisthesis, and mild arthritis in her spine.[2]  (*Id*. at 153, 157.)  Plaintiff repeatedly complained of: (1) persistent back pain; (2) pain with prolonged standing or walking; and (3) pain radiating down her legs.  (*Id*. at 153, 155, 156.)  Plaintiff was prescribed pain medications, which she stated were "helpful" in reducing her pain.  (*Id*. at 150, 153.)  In January 1999, Plaintiff reported that she was "better," but "knows she can't [sic] work."  (*Id*. at 151.)

---

[1]In August 2001, Plaintiff protectively filed an additional application for disability benefits, alleging disability due to disc disease, arthritis, carpal tunnel syndrome, tendinitis, and obesity with an onset date of June 30, 2001.  (Admin. R. at 428–30, 438–47.)  As will be discussed in further detail, the administrative law judge in this case has consolidated Plaintiff's two applications.  (*Id*.)

[2]Spondylolisthesis is either: (1) a forward displacement or slipping of one of the bony segments of the spine over its fellow below, but usually the slipping of the fifth or last lumbar vertebra over the body of the sacrum; or (2) the spinal deformity produced by the slipping forward of the lumbar vertebrae so that they overhang and obstruct the pelvis.  5–S J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 5627 (Matthew Bender 2005).

On December 19, 1998, John Donahue, M.D. performed a physical consultative examination on Plaintiff.  (*Id.* at 136–40.)  Plaintiff's chief complaints to Dr. Donahue were low back pain, carpal tunnel syndrome, and tendinitis in the neck.  (*Id.* at 136.)  Dr. Donahue diagnosed Plaintiff with: (1) low back pain of a mild to moderate nature and without evidence of radiculopathy; (2) possible carpal tunnel syndrome in the right extremity; (3) myofascial pain on the right side; and (4) asthma.[3]  (*Id.* at 139.)  Dr. Donahue opined that Plaintiff could: (1) lift or carry twenty pounds occasionally and ten pounds frequently; (2) stand or walk six hours during an eight-hour day with breaks every two hours; and (3) sit continuously with breaks every two hours during an eight-hour day.  (*Id.*)  Dr. Donahue opined further that Plaintiff would have: (1) limitations in stooping, climbing, kneeling, crouching, and crawling due to her back pain; (2) limitations in pushing, pulling, reaching, and gross manipulation due to her shoulder pain; but (3) no limitations in balancing, feeling, or fine manipulation.  (*Id.*)

On May 9, 1999, clinical psychologist Richard Madsen, Ph.D. examined Plaintiff.  (*Id.* at 162–65.)  Dr. Madsen found that Plaintiff: (1) was of average intelligence; (2) had adequate memory and cognitive function; and (3) showed "[n]o evidence of any delusions, hallucinations, or any other signs of psychotic thinking."  (*Id.* at 163.)  Dr. Madsen diagnosed Plaintiff with major depression and somatization disorder, and opined that her ability to perform work-related

---

[3]Radiculopathy is any disease or abnormality of a spinal nerve root from the point where it merges with the spinal cord to the point where it joins its companion root to form a spinal nerve. 5–R ATTORNEYS' DICTIONARY, *supra* note 2, at 218.  The term myofascial refers specifically to the fasciae, which are thin, tough membranes that surround individual muscles.  4–M ATTORNEYS' DICTIONARY, *supra* note 2, at 7177.

activities "would be mostly affected by her depression and pain," but assessed no specific limitations.[4]  (*Id.* at 164.)

On May 26, 1999, Donald G. Glasco, M.D., P.C. examined Plaintiff and assessed Plaintiff's mental capacity.  (*Id.* at 166–77.)  Dr. Glasco deemed Plaintiff to be of average intelligence and noted that the results of her mental status examination were "reasonably good." (*Id.* at 176.)  Dr. Glasco found that Plaintiff: (1) had moderate limitations in performing activities of daily living and in maintaining social functioning; (2) seldom had deficiencies in concentration, persistence, and pace; and (3) never had episodes of deterioration or decompensation in work settings.  (*Id.* at 173.)  Dr. Glasco found that Plaintiff's: (1) abilities of sustained concentration and persistence, social interaction, and adaptation were not significantly limited; and (2) ability to understand and remember detailed instructions was moderately limited, but her understanding and memory abilities were otherwise not significantly limited.  (*Id.* at 175–76.)  Dr. Glasco opined that Plaintiff did not suffer from an anxiety disorder and diagnosed Plaintiff with major depression and somatization disorder.  (*Id.* at 171, 176.)  Dr. Glasco concluded that Plaintiff was "capable of unskilled work, and her condition [was] likely to improve with treatment."  (*Id.* at 176.)

On August 30, 1999, upon the request of Plaintiff's counsel, licensed psychologist Jose Vega, Ph.D. examined Plaintiff.  (*Id.* at 178–84.)  Dr. Vega found that: (1) Plaintiff's aspect was blunted and her mood depressed; and (2) Plaintiff had an average range of intellectual abilities and

---

[4]Somatization (or somatoform) disorder is a mental disorder characterized by multiple physical symptoms and a complicated medical history involving a variety of organs and systems of the body, but without recognizable physical changes. 5–S ATTORNEYS' DICTIONARY, *supra* note 2, at 4396.

memory.  (*Id.* at 181–82.)  Dr. Vega diagnosed Plaintiff with major depression, pain disorder, and

personality disorder with histrionic traits.[5]  (*Id.* at 183.)  Dr. Vega assessed Plaintiff with a Global

Assessment Functioning ("GAF") score ranging between fifty and fifty-five, suggesting moderate

impairment in social function.[6]  (*Id.*)

On December 22, 1999, Plaintiff presented to St. Mary Corwin Hospital in "an acute

psychotic state."  (*Id.* at 259, 265.)  Plaintiff was taken into custody and detained for a seventy-

two hour period of treatment and evaluation.  (*Id.* at 259.)  Robert Vadnal, M.D. diagnosed

Plaintiff with a psychotic disorder, prescribed Plaintiff anti-psychotic medications, and assessed

Plaintiff with a GAF of fifty-five.  (*Id.* at 265–66.)  On December 25, 1999, Plaintiff was released

from the hospital with instructions to present to Spanish Peaks Mental Health Center ("Spanish

Peaks") for psychiatric follow-up treatment.  (*Id.* at 206, 265–66.)

On December 28, 1999, Plaintiff began outpatient psychotherapy treatment at Spanish

Peaks.  (*Id.* at 281.)  On January 6, 2000, during her intake interview, Plaintiff stated that she had

begun having auditory and visual hallucinations during the previous year, and first received mental

---

[5]Histrionic personality disorder is a character or personality disorder marked by
exaggerated emotions and behavior that solicits attention.  Other symptoms include abnormal
concern with physical attractiveness and sexual seductiveness, rapid shifting of emotions, and
insistence on immediate gratification.  3–H ATTORNEYS' DICTIONARY, *supra* note 2, at 3494.

[6]The GAF scale is a tool for rating an individual's social, occupational, and psychological
functioning.  A GAF score between fifty-one and sixty indicates: (1) moderate symptoms, such as
flat affect and circumstantial speech or occasional panic attacks; or (2) moderate difficulty in
social, occupational, or school functioning, such as maintaining few friends or involvement in
conflicts with peers or coworkers.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., Text Revision, 2000).

health treatment during her hospitalization at St. Mary Corwin the prior month. (*Id.* at 279.)

Treatment notes reveal that Plaintiff subsequently reported she had been having hallucinations

since childhood, and could rarely tell what her hallucinations were. (*Id.* at 291.) Plaintiff

explained that she saw images in the corner of her eye and heard muffled, unintelligible voices.

(*Id.*) Plaintiff's healthcare providers assessed her with a GAF score of sixty. (*Id.* at 292.)

On January 5, 2001, Carlos Rodriguez, Ph.D. performed a consultative psychological

examination on Plaintiff. (*Id.* at 309–15, 477–83.) Plaintiff: (1) complained of recent memory

problems; (2) reported that she had not hallucinated for six months; (3) stated she had been

sexually abused as a child; and (4) described a lengthy history of depression. (*Id.* at 477–78.) Dr.

Rodriguez found that Plaintiff had average intellectual functioning, appropriately developed

memory skills, somatization tendencies, and psychotic symptomatology. (*Id.* at 483.) Dr.

Rodriguez diagnosed Plaintiff with major depression, post-traumatic stress disorder ("PTSD"),[7]

pain disorder, and psychotic thought disorder and assessed Plaintiff with a GAF score ranging

between forty and forty-five.[8] (*Id.*)

---

[7]PTSD is "a syndrome occurring after a person experiences trauma outside the range of normal human experience." 4–P ATTORNEYS' DICTIONARY, *supra* note 2, at 8552. PTSD symptoms include flashbacks, nightmares, severe stress with numbness to stimuli resembling the trauma, anxiety, and depression. *Id.*

[8]A GAF score between forty-one and fifty indicates: (1) serious symptoms, such as suicidal ideation or severe obsessional rituals; or (2) a serious impairment in social, occupational, or school functioning, such as an inability to keep a job or a lack of friends. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, *supra* note 6, at 34 (4th ed., Text Revision, 2000).

On April 2, 2001, Dr. Madsen examined Plaintiff a second time, at the request of the Disability Determination Services section of the Colorado Department of Human Services (the "DDS"). (*Id.* at 325–30.) Dr. Madsen found that Plaintiff's intelligence, abstract reasoning, and short-term memory were all average. (*Id.* at 327.) After performing tests, Dr. Madsen noted Plaintiff's "profile indicate[d] that she tend[ed] to exaggerate her problems, possibly to get attention and/or to get help quicker." (*Id.*) Dr. Madsen diagnosed Plaintiff with major depression, somatization disorder, and personality disorder with histrionic features. (*Id.* at 328.) Dr. Madsen opined that Plaintiff's "depression and tendency to focus much of her attention on medical and physical complaints w[ould] interfere significantly" with her abilities to perform work, but assessed no specific limitations. (*Id.*) Dr. Madsen completed a medical source statement regarding Plaintiff's ability to perform work-related activities, in which he concluded that Plaintiff's impairments: (1) did not limit her abilities to understand, remember, and carry out instructions; (2) slightly affected her abilities to interact appropriately with the public, co-workers, and supervisors; and (3) moderately affected her abilities to respond appropriately to pressures and changes in a usual work setting. (*Id.* at 329–30.)

On January 5, 2002, at the request of the DDS, Jill Breen, M.D. performed a physical examination on Plaintiff. (*Id.* at 512–17.) Dr. Breen diagnosed Plaintiff with a "history of:" (1) carpal tunnel syndrome; (2) back pain; (3) arthritis of the neck, pelvis, knees, hands, and ankles; (4) asthma; and (5) fibromyalgia. (*Id.* at 515.) Dr. Breen noted that "[o]ther than [her] limited range of motion due to her weight," Plaintiff "d[id] not demonstrate significant pain, limited range of motion[,] or neurological deficits." (*Id.* at 515–16.) Based on her findings, Dr. Breen opined

that Plaintiff could: (1) stand and walk about six hours during an average eight-hour day; (2) sit

about six hours during an average eight-hour day; and (3) lift and carry ten pounds frequently and

twenty pounds occasionally.  (*Id.* at 516.)  Dr. Breen opined that "[d]ue to decreased range of

motion, low back pain[,] and knee pain," Plaintiff should be limited to occasional bending,

stooping, and crouching.  (*Id.*)  Dr. Breen assessed Plaintiff to have no "manipulative, visual,

communicative, or other workplace environmental limitations."  (*Id.*)

**2.      Procedural History**

**a.      Plaintiff's Initial Application**

On November 4, 1998, Plaintiff filed an application for disability insurance benefits and

supplemental security income.  (*Id.* at 71–80.)  On January 25, 1999, the Social Security

Administration denied Plaintiff's application.  (*Id.* at 40–44, 336–40.)  On February 16, 1999,

Plaintiff filed a request for reconsideration of her disability.  (*Id.* at 89–92.)  On May 27, 1999, the

Social Security Administration found upon reconsideration that its prior denial of benefits was

proper.  (*Id.* at 46–48, 342–44.)  On October 15, 1999, Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.* at 49–50.)  On November 29, 2000, the ALJ held an initial

hearing, at which Plaintiff and a vocational expert ("VE") testified.[9]  (*Id.* at 346–74.)

---

[9]Although the court refers to the November 29, 2000 hearing as the "initial" hearing, the court notes that an ALJ held a hearing concerning Plaintiff's application on May 24, 2000. (Admin. R. at 389.)  It appears that the proceedings of the hearing were not recorded as required. (*Id.*)  The ALJ did not render a decision, and instead ordered the November 2000 hearing to take place and be recorded.  (*Id.*)

Plaintiff testified that she had last worked on October 20, 1998.  (*Id.* at 351.)  Plaintiff testified that she believed she could not perform her past work because: (1) her carpal tunnel syndrome and tendinitis precluded her from performing "fine point" work; (2) arthritis in her neck prevented her from looking down; and (3) she was unable to stand or walk for long periods of time.  (*Id.* at 357.)  Regarding her physical symptoms, Plaintiff stated her carpal tunnel syndrome caused her some pain in her left arm, but mostly in her right.  (*Id.* at 357–59.)  Plaintiff testified that carpal tunnel pain woke her "several times a night," and both her physical and emotional problems caused her to have trouble sleeping.  (*Id.* at 359, 366.)  Plaintiff stated further that she felt continuous pain in her lower back and down her legs.  (*Id.* at 360.)  Plaintiff testified that she wore a back brace and used a transcutaneous electrical nerve stimulation device ("TENS unit") up to about six hours per day, both of which provided her some relief.  (*Id.* at 359–60.)

Plaintiff also testified about her mental condition.  Plaintiff stated that she was hospitalized for three days because of her depression and received counseling for same.  (*Id.* at 361–62.)  Plaintiff stated that medications had not alleviated her depression.  (*Id.* at 362–63.)  Plaintiff testified that "most of the time" she did not leave her house, and on four or five days a week she would not shower or dress for the day.  (*Id.* at 363–64.)  Plaintiff testified that she needed help brushing her hair and teeth.  (*Id.* at 364.)  Plaintiff testified that she had stopped driving because of hallucinations she had experienced, and had only driven a car twice in the year prior to the November 2000 hearing.  (*Id.* at 364–65.)  Plaintiff maintained that her anxiety made it difficult for her even to ride in a car.  (*Id.*)

The VE testified at the hearing regarding his review of Plaintiff's file. (*Id.* at 367–73.) The VE testified that Plaintiff's past work as: (1) a restaurant cashier was an unskilled, light work position with a specific vocational preparation ("SVP") level of two; (2) both a waitress and an automobile dealership cashier were semi-skilled, light work positions with an SVP level of three; (3) a hostess was a skilled, light work position with an SVP level of six; (4) a bookkeeper was a skilled, sedentary work position with an SVP level of six; and (5) both a receptionist and a payroll clerk were semi-skilled, sedentary work positions with an SVP level of four.[10] (*Id.* at 368–69.) The VE opined that an individual: (1) similarly situated to Plaintiff in age, education, and work background; (2) able to perform a full range of light work; (3) limited to rare contact with the public and only task-oriented work; and (4) precluded from working in environments with noxious fumes or high levels of dust or smoke could perform Plaintiff's former jobs as a bookkeeper and payroll clerk as the work would be performed in the national economy. (*Id.* at 369.) The VE noted that such an individual might not be able to perform the jobs as Plaintiff performed them, because Plaintiff formerly worked in an automobile dealership, where dust, fumes, and smoke might be present. (*Id.*) The VE opined that bookkeeper and payroll clerk jobs were widely available in the national economy. (*Id.* at 370–71.) Additionally, the VE opined that the hypothetical individual described above would be able to perform the jobs of assembler,

---

[10]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

assembler of printed products, and electronics worker, which were all classified as unskilled, SVP

level two, light work positions widely available in the national economy.  (*Id.* at 372.)

On June 28, 2001, the ALJ issued a decision, in which he determined that Plaintiff was not

disabled within the meaning of the Social Security Act, because she retained the residual

functional capacity ("RFC") to perform her past relevant work as a bookkeeper or payroll clerk.

(*Id.* at 12–28.)  On July 12, 2001, Plaintiff requested review of the decision.  (*Id.* at 11.)  On

October 16, 2001, the Appeals Council affirmed the ALJ's decision, making it the final

administrative decision for the purposes of judicial review.  (*Id.* at 9–10.)  On December 28,

2001, Plaintiff filed a complaint in this court.  (Compl. for Judicial Review [filed Dec. 28, 2001].)

On March 19, 2002, Defendant filed an unopposed motion for remand of the case.  (Def.'s

Unopposed Mot. to Remand [filed Mar. 19, 2002].)  Defendant reasoned that it would not be able

to formulate a defense to Plaintiff's complaint, because Plaintiff's claims file and the recordings of

Plaintiff's administrative hearing could not be located.  (*Id.*)  On March 21, 2002, the court

granted Defendant's motion and ordered that subsequent administrative hearings "be held before

an [ALJ] other than the one who handled the prior proceedings."  (Order [filed Mar. 21, 2002].)

### b.      *Plaintiff's Second Application*

On August 8, 2001, Plaintiff filed an additional application for disability insurance benefits

and supplemental security income.  (Admin. R. at 428–30, 546–49.)  On January 24, 2002, the

Social Security Administration denied Plaintiff's application.  (*Id.* at 407–12, 550–54.)  On

February 13, 2002, Plaintiff requested a hearing before an ALJ regarding her disability determination. (*Id.* at 412.) On November 19, 2002, the Social Security Administration set the requested hearing to take place on January 9, 2003. (*Id.* at 413–15.) On December 23, 2002, Plaintiff's counsel requested a continuance of the hearing. (*Id.* at 416–17.) The Social Security Administration granted counsel's request and reset the hearing to take place on June 13, 2003. (*Id.* at 424.) From the record before this court, it appears that Plaintiff made a second request for a continuance, which the Social Security Administration granted by resetting the hearing to take place on July 10, 2003. (*Id.* at 535–37.)

On July 10, 2003, the ALJ held a second hearing, at which Plaintiff again testified at length regarding her work history and physical and mental ailments. (*Id.* at 555–83.) Plaintiff testified that she stood five feet, six inches tall and weighed two hundred fifty pounds. (*Id.* at 570–71.) Plaintiff testified that she had last worked on October 20, 1998. (*Id.* at 559.) Plaintiff testified that she felt her carpal tunnel syndrome, tendinitis, and arthritis precluded her from performing her past work. (*Id.* at 563.) Plaintiff stated that she had carpal tunnel syndrome in both wrists and both hands, which caused her extreme pain. (*Id.* at 564–65.) Plaintiff stated that she had visited doctors and undergone therapy, but only received minimal relief. (*Id.* at 565–66.) Plaintiff testified that she suffered from tendinitis in her arms and shoulders, which caused her great pain and sapped her strength in her arms and hands. (*Id.* at 566.) Plaintiff also testified that she had arthritis in her neck, which caused her pain "only about half the time," and explained that lying down alleviated her neck pain. (*Id.* at 569.) Additionally, Plaintiff testified that she had pelvic arthritis, which caused her constant pain. (*Id.*) Plaintiff stated that she experienced

-12-

constant pain radiating from her lower back to her feet.  (*Id.* at 570.)  Regarding pain

management, Plaintiff stated that she: (1) used a TENS unit daily, which provided her some relief;

(2) had consistently been taking pain medications from 1994 through the time of the hearing in

2003; and (3) had been outfitted with a back brace, but had not worn it for approximately two

years because it no longer fit her due to weight gain.  (*Id.* at 567–68.)  Plaintiff testified that pain

often woke her from her sleep, and she frequently had difficulty falling back asleep after such

waking episodes.  (*Id.* at 575.)

      As to her mental ailments, Plaintiff testified that she experienced: (1) anxiety, which

elevated her heart rate and caused her to "break out in a sweat;" and (2) hallucinations "probably

once a day or more."  (*Id.* at 571, 574.)  Plaintiff stated that she only drove when necessary

because of the hallucinations she experienced.  (*Id.* at 572.)  Additionally, Plaintiff testified that

she had experienced depression since 1978 and suffered from multiple crying spells every day.

(*Id.* at 575–76.)  Plaintiff testified that she had visited mental healthcare providers, and had been

taking medication for her hallucinations and anxiety regularly since 1998.  (*Id.* at 571, 573–74.)

Plaintiff explained that the medications she took seemed to help her "sometimes" and "every once

in awhile" would leave her symptom-free for "a couple of weeks."  (*Id.* at 575.)

      Regarding her activities of daily living, Plaintiff testified that she only left her house on

days she had appointments, showered "maybe once a week," and often did not dress for the day.

(*Id.* at 576.)  Plaintiff testified that she lived with her husband, and neither of them cooked more

than "[m]aybe once a month."  (*Id.* at 578.)  Plaintiff stated that on a normal daily basis she and

her husband ate sandwiches, canned foods, and other pre-prepared foods.  (*Id.* at 579.)  Plaintiff

stated that she performed one household chore per day and her husband performed yard work, did the laundry, and helped her to go grocery shopping.  (*Id.* at 578, 579.)

Upon conclusion of Plaintiff's testimony, a VE prepared to testify.  (*Id.* at 580.)  Plaintiff objected to the VE's testimony because she had not received advance notice thereof.  (*Id.* at 580–83.)  Plaintiff requested yet another continuance of the hearing.  (*Id.* at 583.)  On August 7, 2003, the ALJ held a third hearing, at which the ALJ adopted the findings from the prior ALJ's decision regarding the exertional and skill levels of Plaintiff's past work, as well as Plaintiff's ability to perform her past work.  (*Id.* at 587.)

Based on her review of the vocational exhibits in the record, the VE opined on a series of hypothetical questions posed by the ALJ.  (*Id.* at 587–89.)  The VE testified that an individual: (1) similarly situated to Plaintiff in age, education, and work experience; (2) capable of performing a full range of light work, with an option to alternate between sitting and standing; (3) prohibited from using air, torque or vibrating tools; (4) precluded from performing repetitive gripping or grasping with force and repetitive bending squatting, or kneeling; (5) prohibited from performing work above chest level; (6) prohibited from operating foot or leg controls; and (7) precluded from dealing with the general public; (8) limited to minimal exposure to dust, smoke, chemicals, or fumes; and (9) limited to performing work allowing the individual to wear a back brace would be able to perform the jobs of photocopy machine operator, telephone quotation clerk, and semi-conductor bonder, all of which are either light or sedentary work positions with an SVP level of two.  (*Id.* at 587–88.)  The VE opined further that if the same individual were subject to the additional limitations of: (1) constant, often extreme pain; and (2) an inability to sustain task

activity or to maintain attention to tasks in order to accomplish her activities, the additional limitations would preclude that individual from performing any work. (*Id.* at 588–89.)

On August 20, 2003, the ALJ issued an order consolidating Plaintiff's appeals concerning: (1) this court's March 21, 2002 order of remand on her first application for benefits; and (2) Plaintiff's February 13, 2002 request for a hearing on her second application. (*Id.* at 386–402.) The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because she retained the RFC to perform work "exist[ing] in significant numbers in the national economy." (*Id.* at 391.) In reaching this conclusion, the ALJ first adopted the prior ALJ's finding that Plaintiff had not engaged in substantial gainful activity since October 20, 1998. (*Id.* at 391.) The ALJ next determined that Plaintiff's combination of arthritis, spondylolisthesis, carpal tunnel syndrome, asthma, fibromyalgia, somatization disorder, and obesity caused more than minimal functional limitations, and were therefore severe impairments. (*Id.* at 396.) The ALJ expressly noted that Plaintiff did not assert depression as one of her limiting impairments in her second application. (*Id.* at 391, 438–47.) Thus, the ALJ did not recognize depression as a separate impairment. (*Id.* at 391.) Still, because depressive symptomatology is a necessary element of fibromyalgia, the ALJ specifically considered Plaintiff's depressive symptoms in combination with Plaintiff's other severe impairments. (*Id.*)

Despite their severity, the ALJ determined that Plaintiff's impairments were not sufficiently severe, either individually or in combination, to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation Number 4 (the "Listings"), because the necessary clinical, laboratory, and/or radiographic findings had not been established. (*Id.* at 397.)

Additionally, the ALJ determined that Plaintiff's "testimony about her symptomatology and resulting limitations was not generally credible." (*Id.* at 398.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC "to perform light work with the option to alternate between sitting and standing" and allowing for Plaintiff to wear a back brace while working, subject to the following additional limitations: (1) no using air, torque, and vibrating tools; (2) no repetitive gripping, grasping, bending, squatting, kneeling, crawling, or climbing; (3) no working above chest level; (4) no dealing with the general public; (5) no operating foot or leg controls; and (6) minimal exposure to dust, smoke, chemicals, and fumes. (*Id.* at 399–400.) In accord with this RFC, the ALJ determined that Plaintiff could perform the jobs of photocopy machine operator, telephone quotation clerk, and semiconductor bonder, and therefore was not disabled. (*Id.* at 400.) On September 24, 2003, Plaintiff requested a review of the ALJ's decision. (*Id.* at 384.) On May 31, 2004, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review. (*Id.* at 381–83.)

On October 19, 2005, Defendant simultaneously filed an answer to Plaintiff's initial complaint and a motion to reopen Plaintiff's case in this court. (Def.'s Answer [filed Oct. 19, 2005]; Def.'s Mot. to Reopen [filed Oct. 19, 2005].) On October 20, 2005, the court granted Defendant's motion. (Order [filed Oct. 20, 2005].) On February 10, 2006, the court issued an order to show cause why the case should not be dismissed for failure to prosecute. (Order to Show Cause [filed Feb. 10, 2006].) On March 15, 2006, the parties filed a joint case management plan, thereby discharging the order to show cause. (Jt. Case Mgmt. Plan for Social Security

Cases [filed Mar. 15, 2006]; Min. Order [filed Apr. 6, 2006].)  On June 15, 2006, Plaintiff filed

her opening brief.[11]  (Opening Br. in Supp. of Pl.'s Compl. for Judicial Review [filed June 15,

2006] [hereinafter "Pl.'s Br."].)  On July 17, 2006, Defendant filed a response.  (Def.'s Resp. Br.

[hereinafter "Def.'s Resp."].)  Plaintiff did not file a reply brief.

## ANALYSIS

### 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

---

[11]In her brief, Plaintiff bemoans the length of time that has passed since her initial
application.  (Pl.'s Br. at 1.)  It is worth noting that not all of the delay was beyond Plaintiff's
control.  Plaintiff's repeated requests for continuances and eight-month lag in filing an opening
brief contributed significantly to the lamentably slow progression of Plaintiff's case.

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence.  *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987).  That does not mean, however, that my review is merely cursory.  To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant

evidence that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey*

*v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if

it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also

subject to reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297,

299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.


**2.      *Evaluation of Disability***

        The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).  In proving her disability, a claimant must

make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs which the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2006); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2006); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2006). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established Listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the Listings, the analysis proceeds to the fourth step.

At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). Step four comprises three phases. The first phase requires evaluation of the claimant's physical and mental RFC. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). The second phase requires

analysis of the physical and mental demands of the claimant's past relevant work. *Id.* Finally, the third phase requires a determination whether the claimant has the ability to meet the job demands found in phase two despite the claimant's limitations found in phase one. *Id.* If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e) (2006); *Williams*, 844 F.2d at 751.

If the claimant is unable to perform her previous work, the analysis proceeds to the fifth step, which requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2006); *Williams*, 844 F.2d at 751.

## 3.   *Disability Determination*

Plaintiff sets forth three arguments in support of her contention that the ALJ's decision is erroneous. (Pl.'s Br. at 3.) Plaintiff argues the ALJ erred in: (1) evaluating Plaintiff's credibility and measure of pain; (2) weighing the medical evidence; and (3) relying on the responses to the hypotheticals posed to the VE. (*Id.*)

### a.   *The ALJ's Analysis of Plaintiff's Credibility and Pain*

Plaintiff argues that the ALJ erred in finding Plaintiff to be "not generally credible" and gave inadequate consideration to Plaintiff's testimony and subjective complaints of pain. (*Id.* at 6–8; Admin. R. at 398.) Plaintiff argues that: (1) the ALJ did not follow the correct legal standards; and (2) Tenth Circuit case law requires an ALJ to "give proper weight to the subjective

complaints of pain suffered by a claimant, which as a matter of law need not be confirmed and need not be accepted only by objective 'medical signs and findings.'" (*Id.*) I disagree.

First, Plaintiff boldly misstates the law. The ALJ was not required to accept Plaintiff's allegations regarding pain on blind faith. Quite to the contrary:

> "[a] subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain.'"[12]

*Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir. 1996) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1488 [10th Cir. 1993]). Once this burden is satisfied, the ALJ "must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling." *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987). "The ALJ [is] then required to consider all the relevant objective and subjective evidence and 'decide whether he believe[s] the claimant's assertions of severe pain.'" *Winfrey*, 92 F.3d at 1020 (quoting *Luna*, 834 F.2d at 163). An ALJ "can weigh and evaluate numerous factors in determining the credibility of pain testimony." *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Some of the possible factors include: (1) the levels of medication and their effectiveness; (2) the extensiveness of attempts to obtain relief; (3) the frequency of medical contacts; (4) the nature of daily activities; (5) subjective measures of credibility; and (6) the consistency or compatibility of nonmedical testimony with objective medical evidence. *Id.*

---

[12]Here, Plaintiff clearly satisfied this initial burden. The ALJ found that Plaintiff suffered from spondylolisthesis, arthritis, carpal tunnel syndrome, and fibromyalgia. (Admin. R. at 396.)

In the instant case, Plaintiff appears to argue that the ALJ's credibility determination is not supported by substantial evidence because: (1) nothing in the record establishes that Plaintiff's pain-causing problems do not exist; and (2) no physician's opinions disprove Plaintiff's allegations of pain. (Pl.'s Br. at 6–7.)  As to the former, Plaintiff evidently mischaracterizes the ALJ's findings.  Again, the ALJ found that Plaintiff suffered from spondylolisthesis, arthritis, carpal tunnel syndrome, and fibromyalgia.  (Admin. R. at 396.)  As to the latter, Plaintiff evidently veers away from the ALJ's decision and relevant law.  The ALJ did not find that Plaintiff suffered from *no* pain.  Rather, the ALJ found that Plaintiff's statements about her pain were not fully credible and her reports of her activities conflict with reports of her pain and are "not consistent with the presence of a disabling level of pain." (*Id.* at 398.)

Moreover, the ALJ expressly based his credibility determination on various factors including: (1) inconsistencies in Plaintiff's reporting of her symptoms and response to treatment; (2) incongruity between Plaintiff's testimony, reports of her daily activities, and allegations of pain; and (3) Plaintiff's failure to obtain aggressive medical treatment.  (*Id.* at 399.)  It is worth repeating that in assessing a plaintiff's credibility, an ALJ may consider subjective measures of credibility, the extensiveness of the attempts to obtain relief, the nature of daily activities, and the consistency of the nonmedical evidence with the medical.  *Huston*, 838 F.2d at 1132; *Fessler v. Apfel*, 11 F. Supp. 2d 1244, 1247 (D. Colo. 1988).  Thus, the factors the ALJ used as the basis for his determination are entirely appropriate and fail to constitute an application of an erroneous legal standard.  Still, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence." *Huston*, 838 F.2d at 1133.  Indeed, credibility determinations made by an

ALJ "should not be upset if supported by substantial evidence." *White v. Barnhart*, 287 F.3d

903, 910 (10th Cir. 2001). Here, contrary to Plaintiff's allegations, I find the ALJ's credibility

determination is supported by substantial evidence. I address the ALJ's bases underlying the

determination in turn.

### i.       Inconsistencies in Plaintiff's Reports of her Symptoms

To support his findings of inconsistencies in Plaintiff's reports of her symptoms, the ALJ

expressly makes four citations to the record, and notes that more inconsistencies exist. (Admin.

R. at 399.) The ALJ's record citations reveal that although Plaintiff testified that she experienced

constant pain at a level of ten on a one-to-ten scale, Plaintiff: (1) told Dr. Madsen that her pain

level was a five on a one-to-ten scale, and had reached level ten "several times;" but (2) told Dr.

Vega that her pain level was a five on a one-to-ten scale, and reached level eight on her worst

day. (*Id.* at 162, 181, 564–65.) Further, although Plaintiff testified she "can't [sic] sit or stand"

due to pain and reported to the Social Security Administration that "[it] hurts to sit still," she told

Dr. Rodriguez that on a typical day, she "[sat] on the couch for approximately [one and one-half]

hours, and at times [spent] the entire day sitting on the couch." (*Id.* at 312, 461, 563.) These

clear inconsistencies suffice to serve as substantial evidence supporting the ALJ's decision to

discount Plaintiff's credibility.

### ii.       Inconsistencies in Plaintiff's Reports of Daily Activities

Substantial evidence also supports the ALJ's findings that Plaintiff's reports of her daily

activities "do not support the degree of pain or discomfort alleged." (*Id.* at 399.) In connection

with her first application for disability benefits, Plaintiff testified in November 2000 that she: (1)

rarely left the house; (2) did not shower or dress for the day four or five days a week; (3) needed

help brushing her hair and teeth because of her carpal tunnel symptoms; and (4) rarely drove her

car.  (*Id.* at 363–66, 398.)  Poignantly, in her initial application for benefits, Plaintiff reported that

she: (1) could perform household activities, such as washing dishes, mopping, vacuuming,

dusting, and grocery shopping; (2) left her house two or three times a week for appointments and

errands, and drove her car by herself on such outings; (3) attended movies, concerts, or other

entertainment activities with friends on an average of once per week; and (4) sang and played

music, read the newspaper and the Bible, and studied Greek.  (*Id.* at 88, 95–97.)  In making his

credibility determination, the ALJ underscored the obvious contradiction between Plaintiff's

reports of her daily activities on her application and in her testimony.  (*Id.* at 398.)

Further, in connection with Plaintiff's second application for benefits, in July 2003 she

testified she: (1) showered once a week and rarely dressed for the day; (2) rarely left her house;

and (3) experienced daily pain at a level of ten on a one-to-ten scale in her hands and constant,

twenty-four hour pain in her hips, back, and legs.  (*Id.* at 565, 569–70.)  Despite these complaints,

Plaintiff reported that she was able to drive, perform housework in stages, and go grocery

shopping with her husband.  (*Id.* at 572, 578–79.)  Thus, substantial evidence supports the ALJ's

determination that these activities are not consistent with Plaintiff's complaints of constant,

disabling pain.  (*Id.* at 399.)

### iii.    *Plaintiff's Failure to Seek Medical Treatment*

Substantial evidence also supports the ALJ's decision to discount Plaintiff's credibility due

to her failure to seek out medical treatment, because an ALJ may find credibility lacking when a

Plaintiff does not seek medical treatment for an alleged ailment.  *Fessler*, 11 F. Supp. 2d at 1251.

Plaintiff testified that she had not worn her back brace, which had provided her pain relief, for

approximately two years due to significant weight gain.  (*Id.* at 399, 568.)  As the ALJ noted,

despite this testimony, Plaintiff did not return to the doctor who prescribed her the brace to be

refitted.  (*Id.* at 399.)  Further, and speaking to Plaintiff's credibility more generally, in July 2003,

Plaintiff testified she had consistently been taking medications for her mental health issues

including anxiety, depression, and hallucinations since 1998.  (*Id.* at 399, 573–74.)  Despite this

testimony, Plaintiff reported: (1) in October 2000 that she voluntarily discontinued treatment for

depression; and (2) in February 2001 that she stopped taking her anti-depressant and anti-

psychotic medications because she did not like the way they made her feel.  (*Id.* at 506, 509.)

Finally, the ALJ found that Plaintiff's failure to allege anxiety, depression, or psychosis as limiting

impairments in her second application for benefits belies the severity of the problems and damages

Plaintiff's credibility.  (*Id.* at 399, 439.)  The ALJ's credibility determination is replete with

citations to the record demonstrating substantial evidence to support his decision.  Based on the

foregoing, I find that the ALJ did not err in deciding that Plaintiff was not fully credible or in

disregarding Plaintiff's testimony and subjective complaints of pain.

       **b.**    ***The ALJ's Analysis of the Medical Evidence***

      Plaintiff argues that the ALJ erred in making his disability determination because he did

not follow the relevant "prescribed precedents concerning the legal issues of the effect of

combined impairments and what meets or equals the list of impairments."  (Pl.'s Br. at 4.)

Plaintiff asserts she has definitively demonstrated that "she suffers from degenerative arthritis of

the back, neck, and lower extremities; asthma, depression and a somatoform disorder, impairments that can and do cause significant vocationally relevant limitations." (*Id.*) Ostensibly in support of this contention, Plaintiff makes various citations — occasionally supported by references to the record — to medical evidence proving Plaintiff does indeed suffer from the aforementioned ailments. (*Id.* at 4–6.) Plaintiff then cites the opinions of Drs. Vega, Rodriguez, and Madsen, as well as healthcare providers at Spanish Peaks, to support that Plaintiff suffers from depression. (*Id.* at 5–6.) At the outset, I note that Plaintiff's precise argument is markedly difficult to distill, but equally unconvincing in whatever permutation it takes.

### i.      *Plaintiff's Impairments and the Listings*

To the extent that Plaintiff seeks a determination that: (1) she does indeed suffer from asthma, depression, somatoform disorder, and degenerative arthritis of the back, neck, and lower extremities; or (2) these ailments satisfy the Listings due to their severity, Plaintiff's argument is disingenuous. Plaintiff fails even to mention which Listing or Listings she might satisfy. (*Id.* at 4–6.) More importantly, it is long- and well-established that this court may not reweigh the evidence of record or substitute its judgment for that of the ALJ. *Jordan*, 835 F.2d at 1316. Indeed, this court is tasked only with analyzing whether the ALJ: (1) followed proper legal standards; and (2) supported his decision with substantial evidence of record. *See* 42 U.S.C. § 405(g) (2006); *Hamilton*, 961 F.2d at 1497–98; *Bernal*, 851 F.2d at 299.

To the extent Plaintiff argues the ALJ should have found that Plaintiff suffers from impairments she lists, Plaintiff's argument is puzzling. First, the list of impairments Plaintiff presents in her brief differs from the list of impairments she offered in her application for benefits.

In her application, Plaintiff argued that "spondylolethisis [sic], arth[]ritis, carp[a]l tunnel, tendinitis, asthma, and weight" caused her "constant pain" and limited her ability to work. (Admin. R. at 439.)  Despite her testimony and medical records, Plaintiff *herself* does not make any mention of depression or somatization disorder in her application.  (*Id.* at 438–47.)  This court is hard-pressed to ascertain what error the ALJ might have made in failing to find that Plaintiff suffered from impairments she herself does not allege affected her ability to work — and Plaintiff does not aid the court in this endeavor.  (*See id.* at 439; Pl.'s Br. at 4–6.)  Moreover, given the tenor of the ALJ's opinion, Plaintiff's argument is still more puzzling, because the ALJ *did* consider Plaintiff's depressive and somatoform symptomatology.  As discussed above, the ALJ found that Plaintiff's severe impairments include "arthritis, spondylolisthesis, carpal tunnel syndrome, asthma, fibromyalgia, somatoform disorder, and obesity."  (Admin. R. at 396.)  The ALJ did not recognize depression as an "additional and separate severe impairment," because "depressive symptomatology is a necessary element for a valid diagnosis of fibromyalgia."  (*Id.*)  Nonetheless, the ALJ expressly and explicitly stated that he considered "the effects of depressive symptoms . . . in combination with [Plaintiff's] other severe impairments."  (*Id.*)  In light of the ALJ's holdings, I cannot find that the ALJ failed to consider the impairments Plaintiff now lists before this court.  (Pl.'s Br. at 4.)

Along similar lines, to the extent Plaintiff argues the ALJ wrongly determined that Plaintiff's impairments do not satisfy the Listings because he failed to consider Plaintiff's impairments in combination, Plaintiff's argument is unavailing.  In his decision, the ALJ discussed at length Plaintiff's testimony and medical records concerning her asthma, arthritis, tendinitis,

degenerative disc disease, spondylolisthesis, leg and knee pain, carpal tunnel syndrome, depression, anxiety, hallucinations, somatization disorder, weight, and fibromyalgia. (Admin. R. at 392–99 [citing *id.* at 15–27, 87–88, 95–98, 99–102, 136–40, 141–48, 149–65, 178–84, 186, 265, 276–95, 309–17, 472–75, 509, 512–25].) Further, the ALJ specifically stated that he considered the evidence in its entirety and analyzed Plaintiff's impairments alone and in combination. (*Id.* at 397, 399.) I find nothing in the record to suggest that the ALJ failed to give proper consideration to the evidence or to the severity of Plaintiff's ailments. Accordingly, I find that the ALJ did not err in his determination that Plaintiff's impairments did not meet or equal the Listings.

### ii.     *Plaintiff's Physicians' Opinions*

Further cementing that he properly considered Plaintiff's impairments, the ALJ expressly upheld the prior ALJ's decision and found that secondary to her somatization disorder and the depression associated with fibromyalgia, Plaintiff:

> would have no more than mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.

(*Id.* at 397.) In support of his decision, the ALJ relied upon Dr. Glasco's opinion setting forth the limitations listed above. (*Id.* at 173, 397.) Accordingly, I find that the ALJ's determination was based on substantial evidence.

Plaintiff argues that four mental health care providers found she suffered from depression. (Pl.'s Br. at 5.)  What application this argument has to the ALJ's decision wholly eludes this court.  First, Dr. Glasco's opinion is not inconsistent on the point Plaintiff directly argues.[13]  Dr. Glasco clearly opined that Plaintiff suffered from major depression.  (Admin. R. at 169.)  Further, the ALJ considered each of the four medical sources Plaintiff cites in her argument.  (*Id.* at 394–96.)  Indeed, even cursory review of the ALJ's decision reveals his emphasis on the fact that three of the four medical sources in question assess Plaintiff with moderate symptoms.  (*Id.*)  Dr. Vega assessed Plaintiff with a GAF ranging between fifty and fifty-five, indicating moderate symptoms such as maintaining few friends or involvement in conflicts with peers or coworkers. (*Id.* at 183.)  Plaintiff's healthcare providers at Spanish Peaks assessed her with a GAF of sixty, also indicating moderate symptoms.  (*Id.* at 292.)  Dr. Madsen gave two opinions regarding Plaintiff's limitations.  In 1999, Dr. Madsen found that Plaintiff's ability to perform work-related activities "would be mostly affected by her depression and pain," but assessed no specific limitations.  (*Id.* at 164.)  In 2001, Dr. Madsen opined that Plaintiff's impairments: (1) did not limit her abilities to understand, remember, and carry out instructions; (2) slightly affected her abilities to interact appropriately with the public, co-workers, and supervisors; and (3) moderately affected her abilities to respond appropriately to pressures and changes in a usual work setting. (*Id.* at 329–30.)

---

[13]I use the term "directly" to modify Plaintiff's style of argument with great reluctance.

The ALJ accorded no weight to the opinion of Dr. Rodriguez, the fourth opinion Plaintiff cites.  (*Id.* at 395.)  Dr. Rodriguez: (1) diagnosed Plaintiff with PTSD based on sexual abuse Plaintiff experienced as a child; (2) opined that Plaintiff's results on certain intelligence tests were similar to individuals who tolerate stress and pressure poorly; and (3) assessed Plaintiff with a GAF of forty-five, indicating serious impairments on social and occupational function.  (*Id.* at 477–83.)  Plaintiff indirectly asserts that Dr. Rodriguez's opinion has cachet because Plaintiff visited him at the behest of the Social Security Administration.  (Pl.'s Br. at 6.)  In truth, this issue is of little consequence.  As a one-time examining physician, Dr. Rodriguez is a nontreating source.  *See* 20 C.F.R. § 404.1502 (2006) ("Nontreating source means a physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you.") "[F]indings of a nontreating physician based upon limited contact and examination are of suspect reliability."  *Frey*, 816 F.2d at 515; *see also Henderson v. Sullivan*, 930 F.2d 19, 21 (8th Cir. 1991) (noting courts have "consistently discounted the opinions of non-treating physicians who have seen the patient only once, at the request of the Social Security Administration").

To the extent Plaintiff argues that the ALJ erred in rejecting Dr. Rodriguez's opinion, I disagree.[14]  In assessing the weight any medical opinion deserves, an ALJ must consider several factors, and state "good reasons" for the weight he ultimately assigns the opinion.  *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).  The requisite factors include:

---

[14]I note that Plaintiff does not expressly argue this point, but a generous reading of her arguments could yield such construction, given their amorphous and ethereal nature.

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (citation omitted).  In the instant case, the ALJ accorded Dr. Rodriguez's opinion no weight because it is inconsistent with other medical opinions in the record and Dr. Rodriguez's conclusions therein are "extreme and unsupported."  (Admin. R. at 395.)  I find that the ALJ's reasons are squarely in keeping with the requisite factors and are supported by substantial evidence.

The ALJ: (1) correctly noted Dr. Rodriguez is the only one of Plaintiff's physicians to assess her with a GAF score below fifty; and (2) emphasized that the score Dr. Rodriguez assessed (a GAF ranging between forty and forty-five) was significantly lower than the one medical professionals gave Plaintiff when she was involuntarily taken into custody at St. Mary Corwin Hospital in an "acute psychotic state."  (*Id.* at 265–66, 395.)  The ALJ further evidenced inconsistency by noting that Dr. Rodriguez is the only one of Plaintiff's physicians to diagnose her with PTSD.  (*Id.* at 395, 483.)

Additionally, the ALJ brought the evidence supporting Dr. Rodriguez's PTSD diagnosis into question by citing Plaintiff's contradictory statements to her physicians.  (*Id.* at 395.)  Although Plaintiff told Dr. Rodriguez she had intrusive thoughts about sexual abuse, Plaintiff told Dr. Vega she kept such thoughts about the sexual traumas "buried" and denied experiencing

flashbacks or nightmares regarding same.  (*Id.* at 180.)  Further, healthcare providers at Spanish

Peaks noted that Plaintiff "show[ed] little affect regarding her childhood" despite admitting to

sexual abuse.  (*Id.* at 280.)  The ALJ also discounted the evidence supporting Dr. Rodriguez's

opinion that Plaintiff was unable to tolerate stress and pressure.  (*Id.* at 395.)  Dr. Rodriguez

based his opinion on the fact that Plaintiff's results on certain intelligence tests were similar to

individuals who lacked such tolerance.  (*Id.* at 482.)  The ALJ correctly noted that despite

describing "these individuals" and their symptoms at length, Dr. Rodriguez did not correlate them

with Plaintiff's own symptoms.  (*Id.* at 395.)  The ALJ was thus supported by substantial evidence

and properly disregarded Dr. Rodriguez's opinion as inconsistent and unsupported.  In keeping

with the foregoing, Plaintiff's argument must fail, no matter what form it may take.  I find that the

ALJ did not err in assessing the severity of Plaintiff's impairments or in evaluating the medical

evidence.

### c.      The ALJ's Reliance on the VE's Answers to the Posed Hypotheticals

Plaintiff asserts "the ALJ gave the [VE] a hypothetical [sic]" that was "incorrect and

disingenuous," because it did not contemplate "any of [Plaintiff's] pain and mental health issues of

depression and hallucinations," and argues the ALJ erroneously relied on the VE's response

thereto in making his disability determination.  (Pl.'s Br. at 8.)  Again, I must disagree.  It is true,

of course, that "'[t]estimony elicited by hypothetical questions that do not relate with precision all

of a claimant's impairments cannot constitute substantial evidence to support the

[Commissioner's] decision.'"  *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quoting

*Ekeland v. Bowen*, 899 F.2d 719, 724 [8th Cir. 1990]).  Importantly, in the Tenth Circuit, an

ALJ's hypothetical inquiries "must include all (and only) those impairments borne out by the

evidentiary record."  *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).  Here, the ALJ has

satisfied this rule.

Plaintiff's arguments regarding pain are beyond disingenuous.  I note that the ALJ posed

exactly two hypotheticals to the VE in this case.  (*Id.* at 587–89.)  The first hypothetical involved

an individual similarly situated to Plaintiff in age, educational background, work experience, and

RFC.  (*Id.* at 587–88.)  The second hypothetical envisioned the same individual, with "additional

limitations *as testified to by [Plaintiff] in this matter [] due to pain* that she experiences on a

[twenty-four]-hour a day basis, often at a level of [ten] out of [ten]."  (*Id.* at 588–89) (emphasis

added.)  Even were I to construe Plaintiff's argument to be that the VE improperly *failed* to rely

on the VE's answers to the second hypothetical, it still must fail in light of the requirements under

*Evans*.  As discussed above at *Analysis* § 3a, the ALJ properly discounted Plaintiff's credibility.

It follows logically that because the ALJ properly found Plaintiff to be less than fully credible, the

ALJ properly disregarded the VE's response to a hypothetical containing limitations based only

upon Plaintiff's unreliable testimony.  *See Evans*, 55 F.3d at 532 (holding hypotheticals need only

include those impairments borne out by the record); *see also Talley v. Barnhart*, 113 Fed. App.

185, 187 (8th Cir. 2004) (holding hypotheticals need only include limitations the ALJ finds

credible); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990) (finding VE's response to

hypothetical not binding where hypothetical "did not set forth only impairments which had been

accepted as true by the ALJ").

As to hallucinations, Plaintiff's argument fails for similar reasons.  None of Plaintiff's physicians opined that Plaintiff's alleged hallucinations might impair her ability to work.  (Admin. R.)  Similarly, at no point in the record does Plaintiff assert that her alleged hallucinations would impair her ability to work.  (*Id.*)  Moreover, even if Plaintiff had so asserted, Plaintiff's credibility concerning her allegations about her hallucinations is called into question by the ALJ's findings that Plaintiff: (1) voluntarily stopped taking anti-psychotic drugs and undergoing mental health treatment; and (2) contradicted herself by reporting her hallucinations began in 1999, but later reporting they began during her childhood.  (*Id.* at 394, 399.)  Consequently, the ALJ did not err in omitting Plaintiff's hallucinations, because hypotheticals must only include impairments supported by the record.  *Evans*, 55 F.3d at 532; *Talley v. Barnhart*, 113 Fed. App. at 187; *Talley v. Sullivan*, 908 F.2d at 588.

Finally, Plaintiff's argument also fails as to depressive symptoms, albeit for different reasons.  Here, I look past the ever-important fact that Plaintiff did not allege depression as a disabling impairment in her second application for benefits.  (Admin. R. at 439.)  Instead, I note that Plaintiff fails to specify in her brief what sort of limitation would suffice to speak to her depressive symptoms.  (Pl.'s Br. at 8.)  As discussed at length above at *Analysis* § 3aii, the ALJ found that, secondary to her somatization disorder and fibromyalgia-associated depression, Plaintiff:

> would have no more than mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.

(Admin. R. at 397.)  Although Plaintiff's arguments are muddled and imprecise at points, it is entirely clear that she does not challenge the ALJ's decision to impose these restrictions on Plaintiff.  (Pl.'s Br.)  In light of Plaintiff's acceptance of the ALJ's assessed restrictions, Plaintiff's argument must fail.  The ALJ's first hypothetical question to the VE contemplated an individual subject to the limitation of "no dealing with the general public."  (*Id.* at 588.)  It is markedly difficult to ascertain how this limitation does not contemplate and satisfy the restrictions the ALJ found Plaintiff's depression to cause, and Plaintiff offers no argument to aid the court in its endeavor.  In light of the foregoing, I find that the ALJ's hypothetical questions properly included the specific limitations borne out by evidence in the record, and the ALJ properly relied on the VE's testimony in response to the first hypothetical and disregarded the VE's testimony in response to the second hypothetical in making his disability determination.

**4.**     ***Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 28th day of September, 2006.

BY THE COURT:

s/Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge